UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **FIDELITY & GUARANTY INSURANCE UNDERWRITERS INC. and UNITED STATES FIDELITY & GUARANTY COMPANY,** | § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | |
| **WELLS FARGO BANK, NATIONAL ASSOCIATION** | § § § | CIVIL ACTION NO. H-04-2833 |
| Defendant/Third-Party Plaintiffs, | § § § | |
| v. | § § | |
| **FIRST VICTORIA NATIONAL BANK AS SUCCESSOR IN INTEREST OF AND/OR F/K/A CITIZENS BANK OF TEXAS, NATIONAL ASSOCIATION, PATE & PATE ENTERPRISES, INC., PATE & PATE, L.L.C., PATE BROTHERS CONSTRUCTION, INC., STEVE PATE, and MARTA PATE.** | § § § § § § § § § | |
| Third-Party Defendants. | § | |

**MEMORANDUM AND ORDER**

Pending before the Court is Defendant Wells Fargo Bank, National Association's ("Wells Fargo") Motion for Summary Judgment as to all Plaintiffs' Claims (Dkt. #49). After careful consideration of the parties' arguments, the entire record, and the applicable law, the Court is of the opinion that the motion should be GRANTED in part and DENIED in part.

**Factual and Procedural Background**[1]

Plaintiffs, United States Fidelity and Guaranty Company ("USF&G") and Fidelity and Guaranty Insurance Underwriters, Inc. ("FGIU") (collectively "Sureties"), are commercial surety companies that provide performance, payment, and other related bonds for construction projects. Between early 1998 and 2002, the Sureties provided bonds to two related companies, Pate & Pate Enterprises, Inc. ("Enterprises") and Pate and Pate, L.L.C. ("LLC") (collectively "the Pate Entities"), which were contractors that primarily performed work on underground utility and paving projects. In consideration for issuing the bonds, the written agreements with USF&G and FGIU required the Pate Entities and certain of their insiders and principals to indemnify the Sureties from all bond losses. By early 1998, only Stephen V. Pate ("Pate"), who owned and controlled the Pate Entities, and his wife, Marta Pate, who also shared ownership with Enterprises, were still individually liable under the indemnity agreement.[2] Around this time, based on alleged representations as to the financial strength of Enterprises, the Sureties modified the indemnity obligation of Steve and Marta Pate to relieve them of personal liability to the Sureties for losses on bonds as long as the net worth of Enterprises equaled or exceeded $3.9 million. This case arises from the damages to the Sureties caused by the financial collapse of the Pate Entities.

Wells Fargo is the successor-in-interest to certain banks involved in this case. Norwest Bank, National Association ("Norwest") acquired Wells Fargo Bank, National Association, and

---

[1] The Court notes that the underlying facts and allegations have not changed significantly since this Court's March 31, 2005 Memorandum and Order (Dkt. #40). Except where appropriate updates have been made as to account for procedural developments, this section is largely a reproduction of the factual recitation contained in the Court's previous decision.

[2] Though not an insider or principal, Enterprises was also liable under the indemnity agreement.

chose to operate under the name and logo of "Wells Fargo."  As part of that acquisition, Norwest Texas Bank, National Association, was renamed to Wells Fargo Bank Texas, National Association ("Wells Fargo-Texas"), and Norwest Bank Ohio, National Association, was renamed to Wells Fargo-Ohio, National Association ("Wells Fargo-Ohio").  In November 2003 and February 2004, respectively, Wells Fargo-Texas and Wells Fargo-Ohio were merged and consolidated into Wells Fargo.  In connection with their construction business, the Pate Entities maintained a banking relationship with Wells Fargo, in which they deposited funds received from various owners pursuant to construction projects for the construction of real property in the state of Texas ("Contract Funds").  This relationship apparently began in 1998, when Norwest, the predecessor-in interest to Wells Fargo, sought Enterprises' business.  The Norwest banker who allegedly established the relationship, opened the account, and initially set-up the products and services that were available to Enterprises was David Bockholt.  Bockholt was married to Marta Pate's sister.  Wells Fargo continued the banking system established by Buckholt at Norwest after the Norwest acquisition, and also established an identically structured system for LLC in the fall of 2001.

According to the Sureties, the products and services provided to the Pate Entities by Wells Fargo were facilitating the diversion of funds by Pate and his companies for their own benefit.  In fact, Wells Fargo allegedly continued and even expanded the products and services for the Pate Entities at a time when Wells Fargo knew that the Pate Entities were near, or past, the point of insolvency.  These actions by Wells Fargo allegedly facilitated breaches of statutory and common law fiduciary duties owed by Pate and the Pate Entities to the beneficiaries of the Contract Fund, including the Sureties.  As part of these alleged breaches, Pate allegedly engaged in a check kiting scheme between the accounts of the related companies under Pate's control from at least the late part

of summer of 2001 until March 27, 2002, at which point Wells Fargo froze all of the Pate-related accounts and severed its relationship with Pate and the Pate Entities.

After Wells Fargo froze the Pate Entities' accounts and ended the banking relationship, the Pate Entities failed to make payment for labor and materials and complete performance on a number of construction projects for which USF&G and FGIU had issued bonds. Accordingly, although they had issued new bonds between November 2001 and March 2002, USF&G and FGIU ceased issuing bonds for the Pate Entities in late March 2002. On June 5-6, 2002, the Pate Entities declared to the Sureties that they were in technical default under the bonds issued by the Sureties. From that date until October 20, 2002, USF&G and FGIU worked with the Pate Entities and Pate in an attempt to complete the bonded projects. Agreements were negotiated and signed by the first week of September that provided a mechanism for the Sureties to jointly operate the completion of the bonded projects with LLC, through the creation of a joint trust account for collection and distribution of contract funds and funds to be advanced by the Sureties. However, by the time the agreements had been executed, the financial condition of the Pate Entities had deteriorated to the point that LLC no longer had the capability to complete the bonded projects under the agreements. As a result, the Pate Entities could not sustain their business operations and had to declare defaults on more than 80 projects by September 18, 2002.

On July 13, 2004, USF&G and FGIU commenced this lawsuit against Wells Fargo. At that time, payments under the relevant bonds exceeded $47 million, while the net loss under the bonds exceeded $32 million. The Sureties further alleged that the total potential exposure on the payment and performance bonds is approximately $366 million. In addition to seeking declaratory judgment on two issues related to Wells Fargo's involvement with the Pate Entities, USF&G and FGIU also

asserted causes of action for aiding an abetting, unjust enrichment, money had and received, conspiracy, negligence, and gross negligence. Wells Fargo answered on August 23, 2004 (Dkt. #8), and then filed a Third-Party Complaint on September 3, 2004, in which it seeks to hold certain third parties, including the Pate Entities, proportionately liable for any damages assessed against it. On September 15, 2004, Wells Fargo filed a motion seeking to dismiss each of the claims brought by USF&G and FGIU. After considering the motion, this Court dismissed USF&G and FGIU's claims of negligence, unjust enrichment, and for attorneys' fees under the Texas Declaratory Judgment Act ("DJA") and Texas Government Code, which left the following claims: (1) aiding and abetting; (2) civil conspiracy; (3) money had and received; and (4) declaratory judgment under the DJA, but without the right to recover attorneys' fees. On June 22, 2005, Wells Fargo filed this motion for summary judgment seeking judgment as a matter of law as to these remaining claims. USF&G and FGIU filed a response to the motion on July 18, 2005.

**Discussion**

In its motion, Wells Fargo seeks summary judgment as to all remaining claims against it based on several arguments. First, Wells Fargo asserts that it cannot be liable under the Texas Proportionate Responsibility Statute (TEX. CIV. PRAC. & REM. CODE §§ 33.001, *et seq.*), which governs apportionment of tort liability among defendants, because the Sureties admit that the Pate Entities are responsible for 100% of the Sureties' alleged damages. Second, Wells Fargo argues that the relationship between it and the Pate Entities does not represent the type of relationship that would constitute the other limited circumstance in which the law recognizes joint and several liability for the tortious acts of another independent of fault. Third, Wells Fargo asserts that the Sureties cannot maintain an action for money had and received because the Texas Property Code

5

provision relied for recovery upon does not apply to banks; and finally, the Sureties' remaining DJA claims are either incorrect or immaterial in light of the conclusions as to the other issues outlined above. The Court will address these arguments below.

**I.     Standard of Review**

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Christopher Village, LP v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment, there must be an absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). An issue is "material" if its resolution could affect the outcome of the action. *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id.* at 322. If the moving party fails to meet this burden, then they are not entitled to a summary judgment and no defense to the motion is required. *Id*.

"For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact

warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718-19 (5th Cir. 1995); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). To prevent summary judgment, the non-movant must "respond by setting forth specific facts" that indicate a genuine issue of material fact. *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999).

When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant. *See In re Segerstrom*, 247 F.3d 218, 223 (5th Cir. 2001); *see also Samuel v. Holmes*, 138 F.3d 173, 176 (5th Cir. 1998). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence, disregard all evidence favorable to the moving party that the jury is not required to believe, and give credence to the evidence favoring the nonmoving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Willis v. Moore Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *See TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

**II.     Analysis**

As noted above, the Sureties' remaining claims include aiding and abetting, civil conspiracy, money had and received, and declaratory judgment under the DJA, but without the right to recover attorneys' fees. The Court will discuss each below.

### A.     Vicarious/Derivative Liability

In its motion, Wells Fargo attacks the Sureties' remaining tort claims for aiding and abetting and conspiracy on the grounds that it is an innocent party that cannot be liable for the acts of third

party tortfeasors. In support of its argument, Wells Fargo points to Plaintiffs' First Amended Response to Defendant/Third Party Plaintiff's Request for Admissions and First Set of Interrogatories,[3] in which Wells Fargo requested by interrogatory that the Sureties state the percentage of responsibility for the harm suffered by them attributable to various persons and entities.[4] In response, the Sureties state the following:

> One Hundred Percent of the harm was caused by the Pate Entities (Pate & Pate Enterprises, Inc., Pate & Pate, L.L.C., and Pate Brothers Construction Co., Inc.) through the actions of their officers, Stephen Pate and Janet Fulp Hruska. Wells Fargo is derivatively responsible for 100% of the harm caused by the Pate Entities based on the acts and omissions pled in the Original Complaint filed in this case.[5]

Based on this response from the Sureties, Wells Fargo asserts that summary judgment is appropriate because the Texas Proportionate Responsibility Statute (TEX. CIV. PRAC. & REM. CODE §§ 33.001, *et seq*.), which largely supplanted joint and several liability for most torts in Texas, allows recovery of damages against a defendant for the percentage of responsibility attributed to that specific defendant for "causing or contributing to cause in any way the harm for which recovery is sought." TEX. CIV. PRAC. & REM. CODE § 33.003(a). Wells Fargo notes that the express language of the statute indicates that it applies to "any cause of action based on tort . . . ." *Id*. at § 33.002. As a result, Wells Fargo concludes that it is not liable as a matter of law because the Sureties admit that "One Hundred Percent of the harm was caused by the Pate Entities . . . ."

---

[3] Dkt. #49, Ex. 1.

[4] The Court notes that the Sureties objected to this interrogatory, as well as Wells Fargo's Request for Admission No. 1, on the grounds that apportionment of fault does not apply in this case as between the Pate Entities and Wells Fargo. *See id.*, Ex. 1, at p.3. Although there is disagreement as to the validity and status of the objections, the Court finds, for reasons explained more thoroughly below, that the discovery responses at issue are consistent with the applicable law as well as the Sureties' position. Therefore, it is not necessary for the Court to address the merits of the Sureties' objections.

[5] Dkt. #49, Ex. 1, p. 6.

8

While Wells Fargo recognizes that there are exceptions to the joint and several liability bar, it contends that those exceptions do not apply to this case. First, Wells Fargo argues that neither of the two exceptions within the Proportionate Responsibility Statute apply because (1) it is not more than 50% directly liable for the Sureties' injuries, nor (2) did it, "with specific intent to do harm to [the Sureties], act[] in concert, with [the Pate Entities] to engage in conduct described in" certain enumerated sections of the Penal Code. TEX. CIV. PRAC. & REM. CODE § 33.013. Second, Wells Fargo contends that vicarious liability outside the context of the Proportionate Responsibility Statute does not apply. Wells Fargo acknowledges that vicarious liability may arise when certain defendants, due to the nature of their relationship with one another, are jointly and severally liable for damages to an injured plaintiff. For example, Wells Fargo identifies vicarious liability as arising in the employer/employee context, and also when defendants share an existing business relationship such as a partnership or agency, where the parties have agreed to be responsible for and bound by the other's action. However, it asserts that a bank's relationship with its customer does not give rise to the type of relationship recognized under the law for imposition of vicarious liability. Wells Fargo warns that imposition of vicarious liability to this relationship would suddenly mean that banks were jointly and severally liable for every tortious act of their customers, including insufficient checks, which would result in lenders finding themselves as insurers of their customers.

In response to Wells Fargo's arguments, the Sureties explain that they are not alleging that Wells Fargo committed a primary or direct tort in breach of a duty the bank owed to the Sureties. Instead, the Sureties assert that their claims against Wells Fargo are derivative in nature, and therefore, based on the conduct of the Pate Entities that caused or contributed to the cause of the harm. The Sureties point out Wells Fargo's admission that the Proportionate Responsibility Statute fails to address certain vicarious liability cases, which clearly remain subject to joint and several

9

liability imposition. According to the Sureties, this apparent omission, without further direction from the state legislature, must be construed in favor of permitting joint and several liability in derivative actions. The Sureties warn that adopting Wells Fargo's position would virtually eviscerate such causes of action that seek recovery from a defendant who, although not directly responsible for the underlying tort, has been accused of highly culpable conduct like aiding and abetting the breach of a fiduciary duty.

Initially, the Court notes that courts and commentators alike have recognized the difficulty in reconciling the language of the Proportionate Responsibility Statute with certain causes of actions, including vicarious and/or derivative liability actions. *See, e.g.*, *F.F.P. Operating Partners, L.P. v. Duenez*, ___ S.W.3d ___, 2004 WL 1966008, 47 Tex. Sup. Ct. J. 1068, 2004 WL 1966008 (Tex. Sept. 3, 2004) (reconciling apparent conflict between Proportionate Responsibility Statute and Dram Shop Act, which imposes vicarious liability); *Bedford v. Moore*, 166 S.W.3d 454, 466-64 (Tex. App.— Fort Worth 2005, no pet.) (considering effect of Proportionate Responsibility Statute on vicarious or derivative liability actions); *see generally* William D. Underwood & Michael D. Morrison, *Apportioning Responsibility in Cases Involving Claims of Vicarious Derivative, or Statutory Liability for Harm Directly Caused by the Conduct of Another*, 55 BAYLOR L. REV. 617, 647-48 (2003) (postulating that the legislature, in enacting the original and present versions of section 33.003, did not consider derivative or vicarious liability cases). Although the language of the statute itself indicates a clear legislative preference for apportionment of responsibility in all tort actions, it is equally clear that an apportionment scheme is not proper in certain cases. *See Rosell v. Cent. W. Motor Stages, Inc.*, 89 S.W.3d 643, 656-57 (Tex. App.—Dallas 2002, pet. denied) (noting that, "while the statute on its face requires all defendants to be included in the apportionment

question, it would not be proper for an employer to be included along with the driver if its only responsibility was that of *respondeat superior*").

Here, the Court is tasked with determining whether the Sureties claims for aiding and abetting and/or conspiracy should be included under the apportionment scheme outlined in the Proportionate Responsibility Statute. First, however, it is necessary to properly characterize the claims at issue. These claims are not pure vicarious liability claims because they require that the Sureties prove certain wrongful conduct on the part of Wells Fargo. *See Bedford*, 166 S.W.3d at 461 (noting that pure vicarious liability, such as *respondeat superior* liability, attribute liability to one party based on the actions of the other party regardless of any allegation of fault of the party held vicariously liable); *see also* Dkt. #40, p.16 (describing that the Sureties must prove "substantial assistance" on the part of Wells Fargo in order to prevail). Instead, the claims are more appropriately characterized as derivative in nature. In other words, "[u]nlike cases involving pure vicarious liability, cases of derivative liability . . . involve wrongful conduct both by the person who is derivatively liable and the actor whose wrongful conduct was the direct cause of injury to another. The liability is derivative because it depends upon a subsequent wrongful act or omission." Underwood & Morrison, *supra*, at 619 (citations omitted).

The Court notes that some courts considering derivative liability claims in the negligent hiring/entrustment context have reached the conclusion that the derivatively liable party's negligence should be submitted to the jury for apportionment. *See Bedford*, 166 S.W.3d at 461. Yet, joint and several liability as between the derivatively liable party and the primary actor still applies, but the apportionment accounts "for recovery by the hiring or entrusting employer from the driver, based on the percentages of responsibility assessed by the jury." *Id*. at 463. Likewise, the Texas Supreme Court in *Duenez* concluded that a party's independent wrongful actions of

11

continuing to provide alcohol to an obviously intoxicated person in a Dram Shop Act action should be submitted to the jury for apportionment, even though the provider was also derivatively liable for the acts of the intoxicated person that caused the plaintiff harm. *See Duenez*, --- S.W.3d ----, 2004 WL 1966008, at *4-5. Despite the statutory apportionment regime, the Texas Supreme Court concluded that the liability for the intoxicated driver was imputed entirely to the dram shop, and that submission of the dram shop's own independent actions for apportionment allow "the dram shop [to] recover from the driver based upon the percentages of responsibilities that the jury assessed between them." *Id.* at *5.

Wells Fargo points out that the Texas Supreme Court in *Duenez* faced a specific statute that imputed liability, and that absent such a statute, the Proportionate Responsibility Statute controls. While it is true that the statute involved in *Duenez* did impose derivative liability, the Texas Supreme Court also notes in its opinion that its conclusion comports with traditional notions of vicarious and derivative liability. Specifically, the court explained,

> This construct comports with the rule stated in section 13 of the Restatement of Apportionment of Liability that "[a] person whose liability is imputed based on the tortious acts of another is liable for the entire share of comparative responsibility assigned to the other . . . ." RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIABILITY § 13 (2000). While section 13 refers to the situation in which a party is held vicariously liable solely on the basis of another's conduct, the Restatement makes clear that a party to whom liability is imputed and who is also independently liable "is responsible for the share of the verdict assigned to [the party whose liability is imputed] and is also responsible for the share of the verdict assigned to its own negligence." *Id.* § 7 cmt. j (2000).

*Id.* at *5. In light of the citation of this language with apparent approval, it is evident that the court considered joint and several liability to be applicable in the context of derivative actions even absent a specific statute.

Moreover, this Court finds that joint and several liability is particularly appropriate given the specific claims at issue in this case. In the context of conspiracy or other concerted action

claims, the Legislature enumerated certain instances when a party acting in concert with another should be held jointly and severally liable. *See* TEX. CIV. PRAC. & REM. CODE § 33.013 (listing various sections of the Texas Penal Code). Wells Fargo argues that by expressly naming certain sections of the penal code, "the Legislature prohibited joint and several liability against defendants found liable for concerted action claims like conspiracy and aiding and abetting that do not involve circumstances that rise to the higher, criminal level of culpability." Dkt. #49, p.10. Yet, although the claims at issue in this case are civil claims, they plainly require a higher level of culpability than mere negligence. *See* Dkt. #40, pp.12-15 (describing higher level of culpability required to maintain aiding and abetting claim); *Operation Rescue-National v. Planned Parenthood of Houston and Southeast Texas, Inc.*, 975 S.W.2d 546, 553 (Tex. 1998) (requiring "meeting of the minds" and one or more unlawful, overt acts for civil conspiracy).

Finally, Wells Fargo urges that the relationship between banks and their customers must not represent the type of relationship that gives rise to joint and several liability. The Court agrees generally, but concludes that the relationship between a primary tortfeasor and an aider and abettor or conspirator does justify joint and several liability. Wells Fargo is correct in cautioning against recognition of vicarious or derivative liability generally between banks and their customers. However, Wells Fargo misconstrues the nature of the relationship responsible for the imputation of liability. It is not the banking relationship itself that gives rise to derivative liability, it is the allegation that the bank in this circumstance knowingly and willfully aided and abetted and conspired in certain conduct by another party. In other words, Wells Fargo's concern that banks would be liable for the tortious acts of their customers, including the passing of insufficient checks, is unfounded because such derivative liability is specifically confined to cases where the bank has

engaged in highly culpable conduct that justifies imputation. Absent allegations of aiding and abetting, therefore, a bank, or any other party, would not be held liable for any act of its customers.

In light of the fact that the Proportionate Responsibility Statute has already been declared inappropriate in certain contexts, *see, e.g., Rosell*, 89 S.W.3d at 657, as well as the fact that the claims at issue in this case involve allegations of highly culpable conduct, this Court concludes that joint and several liability is appropriate in this case as to the claims at issue. As such, summary judgment is not proper.

### B.     Texas Property Code Chapter 162

Wells Fargo also seeks summary judgment as to the Sureties' claim for money had and received, as well as the claim under the DJA that seeks to have the Court declare that the statutory exemption created for banks under Texas Property Code Chapter 162 is inapplicable to Wells Fargo's conduct and the Sureties' claims. In support of its argument, Wells Fargo characterizes the Sureties' allegations as follows: "Plaintiffs allege that the Bank wrongfully withheld money the Pate Entities paid for banking services because those monies were trust funds under the Texas Property Code § 162.001, *et seq.*, which allegedly, should have been used to pay Contract Beneficiaries or presumably, the Plaintiffs themselves." Dkt. #49, p.19. According to Wells Fargo, however, the statute at issue, while imposing a duty upon contractors to ensure that subcontractors and materialmen are paid, specifically exempts banks. Thus, the Sureties' claim for money had and received, which Wells Fargo insists is predicated on Chapter 162, fails as a matter of law, and the request for declaratory judgment must be denied.

In response, the Sureties maintain that their action for money had and received is premised on Wells Fargo's receipt of funds through their knowing involvement and willful participation in the Pate Entities' conduct. As such, the Sureties contend that the funds frozen and trapped by Wells Fargo, in equity and good conscience, belong to them under a doctrine of equitable subrogation. As

14

to the request for declaratory judgment, the Sureties insist that Wells Fargo confuses their request for declaratory judgment that the scope of the exemption for banks under Chapter 162 is inapplicable in this case, with a request for Wells Fargo's liability under the statute. Because the Sureties are not seeking to hold Wells Fargo liable under the statute, but rather to have the Court declare that it does not serve as a defense, the Sureties argue that their claim is appropriate.

Chapter 162 of the Code, entitled "Construction Payments, Loan Receipts, and Misapplication of Trust Funds," provides that construction payments made to a contractor, subcontractor, or to an officer, director, or agent of a subcontractor or contractor pursuant to a construction contract for the improvement of specific real property are deemed to be trust funds. *See* TEX. PROP. CODE § 162.001, *et seq.* Specifically, § 162.001 states that:

> An artisan, laborer, mechanic, contractor, subcontractor or materialman who labors or furnishes labor or material for the construction or repair of an improvement on specific real property in this state is a beneficiary of any trust funds paid or received in connection with the improvement.

*Id*. This provision was enacted to serve as a special protection for subcontractors and materialmen in situations where contractors or their assignees refused to pay the subcontractor or materialman for labor and materials. *See In re Waterpoint Intern. LLC*, 330 F.3d 339, 345 (5th Cir. 2003). The Code imposes fiduciary responsibilities on contractors to ensure that subcontractors, mechanics and materialmen are paid for work completed. *Id*. The misapplication of these trust funds is a criminal offense under the Code. *See* TEX. PROP. CODE §§ 162.031-032. However, § 162.004 clearly states that the provisions of Chapter 162 do not apply to a "bank" or "other lender," such as Wells Fargo. *See In re Waterpoint Intern. LLC*, 330 F.3d at 345-46 (noting that the Texas Supreme Court had "plainly stat[ed] that the trust fund provisions of the Code do not apply to banks *in any situation*.") (emphasis added) (citing *Republicbank Dallas, N.A. v. Interkal*, Inc., 691 S.W.2d 605, 606 (Tex. 1985)).

15

As the Court noted in its previous decision, an action for money had and received arises when the defendant obtains money which in equity and good conscience belongs to the plaintiff. Dkt. #40, p.19 (citing *Austin v. Duval*, 735 S.W.2d 647, 649 (Tex. App.—Austin 1987, writ denied); *Staats v. Miller*, 150 Tex. 581, 243 S.W.2d 686, 687 (1951)). Although the Court concluded that the Sureties had sufficiently stated a claim for money had and received for purposes of surviving Rule 12(b)(6) scrutiny, the Court explicitly stated that it did not reach the merits of the claim, and that arguments as to the merits were more appropriately presented in a summary judgment motion. *Id.* at 19. In order to establish that money Wells Fargo obtained instead belongs to them in equity and good conscience, the Sureties necessarily would have to establish some type of right of possession to the funds, which necessitates application of Chapter 162. In light of the clear statutory language, as well as the case law construing it, the Court now finds that the Sureties' claim for money had and received fails as a matter of law to the extent it seeks funds from Wells Fargo based on any duty Wells Fargo had under Chapter 162. Wells Fargo has no duty under Chapter 162, and is exempt from its reach. Furthermore, the claim for money had and received fails as a matter of law to the extent the Sureties' claim is based on any right or entitlement to funds, whether such alleged right is their own or represents a right of subrogation, arising under Chapter 162 of the Texas Property Code. In so finding, the Court notes that the Sureties are not left without a remedy, only that a claim for money had and received does not provide the relief it seeks under the circumstances of this case. Instead, as they have done, the Sureties are able to seek recovery of damages it incurred as a result of the conduct of the Pate Entities, for which Wells Fargo could be derivatively liable as a result of its alleged actions.

Although the preceding discussion regarding the money had and received claim largely resolves the declaratory judgment action regarding Chapter 162's applicability, the Court recognizes the Sureties' complaint also seeks a declaration that the scope of the statutory exemption for banks under Chapter 162 cannot serve as a partial or complete defense to any cause of action brought by

the Sureties. Dkt. #1, ¶ 35. With the clear exception of the money had and received claim, the Court cannot discern any defense provided by the exemption in Chapter 162 that would be applicable to aiding and abetting and conspiracy claims. To this extent, the Sureties' declaratory judgment request survives.

### C.     Remaining DJA Claim

In their remaining claim for declaratory judgment, the Sureties seek a declaration under the DJA that Wells Fargo-Ohio is the alter ego of Wells Fargo-Texas, or that, alternatively, Wells Fargo-Texas and Wells Fargo-Ohio were acting as a single business enterprise. Wells Fargo's argument as to this claim is based on the presumed absence of a justiciable controversy because it contends that summary judgment was proper as to all of the other claims. Indeed, if no other claims remained between the parties, a declaratory judgment would be improper and immaterial. As a result of the Court's conclusion that summary judgment is improper as to the Sureties' aiding and abetting and conspiracy claims, however, the Sureties continue to have viable claims against Wells Fargo. Thus, summary judgment as to this claim is inappropriate.

### Conclusion

For the foregoing reasons, Wells Fargo's Motion for Summary Judgment as to all Plaintiffs' Claims is hereby GRANTED in part and DENIED in part.

Signed this 31st day of March, 2006.

_____
JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE

17